**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

M<span style="font-size:smaller">ILO</span> L. C<span style="font-size:smaller">ARLSON</span>,                                                                     C<span style="font-size:smaller">IVIL</span> N<span style="font-size:smaller">O</span>. 01-1000 MJD/AJB

          P<span style="font-size:smaller">LAINTIFF</span>,

V.                                                                                                **R<span style="font-size:smaller">EPORT AND</span> R<span style="font-size:smaller">ECOMMENDATION ON THE</span>**
                                                                                                        **P<span style="font-size:smaller">ARTIES</span>' C<span style="font-size:smaller">ROSS</span> M<span style="font-size:smaller">OTIONS</span>**
                                                                                                        **<span style="font-size:smaller">FOR</span> S<span style="font-size:smaller">UMMARY</span> J<span style="font-size:smaller">UDGMENT</span>**

J<span style="font-size:smaller">O</span> A<span style="font-size:smaller">NNE</span> B. B<span style="font-size:smaller">ARNHART</span>, C<span style="font-size:smaller">OMMISSIONER OF</span>
S<span style="font-size:smaller">OCIAL</span> S<span style="font-size:smaller">ECURITY</span>,

          D<span style="font-size:smaller">EFENDANT</span>.

_____

Edward C. Olson, Esq., for Plaintiff, Milo L. Carson.

Lonnie F. Bryan, Assistant United States Attorney, for Defendant, the Commissioner of Social Security.

_____

**I.      INTRODUCTION**

Plaintiff Milo L. Carlson (Carlson) disputes the unfavorable decision of the Commissioner of the Social Security Agency (Commissioner) denying his claim for a period of disability and disability insurance benefits under Title II of the Social Security Act. This matter is before the court, United States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the district court on the parties' cross motions for summary judgment. *See* 28 U.S.C. § 636 (b)(1) and Local Rule 72.1. Based on the reasoning set forth below, this court **recommends** that Carlson's Motion for Summary Judgment [Docket No. 20] **be denied** and that the Commissioner's Motion for Summary Judgment [Docket No. 23] **be granted**.

**II.     ISSUES BEFORE THE COURT**

There is only one main issue before the court; whether Administrative Law Judge (ALJ) William S. Herbert correctly analyzed Carlson's subjective complaints under the guidelines set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). A second issue arises only if the ALJ's analysis of Carlson's subjective complaints was faulty; whether, based on a faulty analysis of Carlson's subjective complaints, the hypothetical posed by the ALJ to the vocational expert was based on substantial evidence.

**III.    PROCEDURAL HISTORY**

Carlson filed an initial application for Disability Insurance Benefits (DIB) on August 29, 1997, with a claimed onset date of April 4, 1992. (T. 133.) The application was denied initially and on reconsideration. Carlson requested and received a hearing before ALJ Charles J. Frisch. On October 29, 1998, ALJ Frisch issued a decision denying Carlson benefits. The ALJ's decision, however, incorrectly identified Carlson's "date of last insured" as December 31, 1998. ALJ Frisch subsequently issued an amended decision on April 28, 1999, correcting the date of last insured to September 30, 1998.

Prior to the amended decision being issues, Carlson filed a second application for DIB on November 25, 1998, alleging a disability onset date of October 30, 1998, one day after the issue date of ALJ Frisch's first unamended decision. The issuance of ALJ's mended order, however, placed the October 30, 1998, alleged onset date outside of Carlson's insured period. On April 26, 2000, ALJ Jerome J. Berkowitz dismissed Carlson's second application based on res judicata. The Appeals Council upheld ALJ Berkowitz's decision. The April 26, 2000, decision is not at issue in the present

2

matter.

On June 4, 2001, Carlson initiated an action in this court appealing ALJ Frisch's April 28, 1999, denial of benefits.  The court granted the Commissioner's motion to remand and the matter as returned to the agency for further proceedings.  On July 16, 2003, pursuant to an order from the Appeals Council, ALJ William S. Herbert conducted an administrative hearing regarding Carlson's first application for DIB.  On January 30, 2004, ALJ Herbert issued an unfavorable decision, finding that while Carlson was not able to perform his past relevant work, he was able to perform other jobs which existed in significant number in the local and national economy.  Carlson filed a request for review along with additional evidence to the Appeals Council.  The Appeals Council denied review, making ALJ Herbert's decision the final decision of the Commissioner.  Based on the Commissioner's final decision denying DIB, Carlson filed an action in this court to reopen the matter.  Both parties have filed motions for summary judgment.

**IV.    FACTUAL BACKGROUND AND MEDICAL HISTORY**

Carlson was born on October 8, 1957, and was 45 years old at the time of the hearing before ALJ Herbert.  (T. 94.)  He has completed high school and five years of vocational training.  (T. 271.)  His previous work experience includes work as a bricklayer.  (T. 221.)  After suffering a back injury, he had further vocational training as a machine operator and worked for a short time as a boxing machine operator.  (T. 51.)

Carlson's back injury occurred in April 1992, while he was working as a bricklayer.  (T. 292.)  In May 1992, a radiology report noted that Carlson had a "bulging disc at L5-S1 with herniated component on the left, displacing the left S1 nerve root posteriorly."  (T. 282.)  On May 20, 1992,

Carlson's treating neurologist, Dr. Gregg Dyste, while noting the radiology report, diagnosed Carlson with lumbar spondylosis. (T. 293.) Dr. Dyste stated that "the optimal treatment for Mr. Carlson would be continuing with therapy with attention to a back [rehabilitation] program." (*Id*.) Dr. Dyste noted that Carlson would be off of work for four to six weeks while completing the therapy program, but should be able to make a full recovery. (*Id*.)

Carlson underwent a work hardening program in June 1992. (T. 315.) The occupational medical specialist, Judy Zacharius, noted in her report: "Subjectively, Milo has been consistent with his reports of pain. However, objectively Milo has not been seen in any significant distress." (*Id.*) Zacharius also noted that Carlson had "excellent body mechanics" and that he "tolerated most activity well." (T. 316.) She concluded that, at that time, Carlson would be able to return to work on a part-time basis with a recheck in one month. (*Id.*) She advised Carlson to continue to use a TENS (transcutaneous electrical nerve simulator) unit to help control the pain and to exercise to help maintain strength and flexibility. (*Id.*)

In July 1992, Dr. Dyste noted that Carlson was disabled from work as a "block layer" indefinitely as of May 20, 1992. (T. 291.) Dr. Dyste continued the diagnosis of lumbar spondylosis and stated that he did not believe that any further physical therapy was warranted. Dr. Dyste also stated: "I have stresses that he should try and remain as active as he possibly can so as to avoid losing any of the gains that he has made over the past eight weeks." (*Id.*)

In August 1992, Dr. Dyste explained that Carlson had "reached maximum medical improvement as of July 17, 1992." (T. 290.) He determined that Carlson suffered from a 10.5% disability due to multiple levels of spondylosis. (*Id*.) Dr. Dyste saw Carlson again on March 25, 1994,

4

for pain in the lower back. (T. 289.) He stressed to Carlson the importance of continuing the exercises that Carlson had learned in physical therapy. (*Id*.) Dr. Dyste noted that there was no specific treatment for Carlson's back problems that would allow a rapid recovery, but that it was "something that simply needs to run its course." (*Id.*)

On January 25, 1997, Carlson visited his primary care clinic and was seen by Dr. George B. Renier. (T. 274.) Dr. Renier noted that Carlson was in severe distress with intervertebral disc herniation. (*Id*.) Dr. Renier recommended that Carlson start on 600 mg ibuprofen, 750 mg Robaxin,[1] and Vicodin.[2] (*Id.*) Dr. Renier also recommended that Carlson be seen by Dr. Dyste as soon as possible. (*Id*.) Carlson again visited his primary care clinic on February 4, 1997, where he was seen by Dr. Dale A. Berry. (*Id*.) Dr. Berry ordered a CT scan, prescribed Percocet,[3] and continued the Robaxin. (*Id*.)

Carlson saw Dr. Dyste on February 18, 1997. (T. 286.) Dr. Dyste noted that he had treated Carlson in 1992 for a myofascial strain in the region of the right sacroiliac joint. (*Id*.) He stated that Carlson told him "that physical therapy and the passage of time was successful in alleviating the majority of his pain" at that time. (*Id.*) Carlson explained that he began having back pain and bilateral leg pain on January 23, 1997, after picking up a laundry basket. (*Id.*) Dr. Dyste noted mild tenderness along the sacroiliac joint and that the "[r]ange of motion of the lumbar spine was limited because of back pain

---

[1] Robaxin is "a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." *MedlinePlus Drug Information* at http://www.nlm.nih.gov/medlineplus/druginformation.html.

[2] Vicodin is used to relieve moderate to moderately severe pain. *Id*.

[3] Percocet is used to relieve moderate to moderately severe pain. *Id*.

with motion." (T. 287.) He stated that, because no diagnostic testing had been completed since Carlson's last visit three years earlier, Carlson should undergo an MRI of the lumbar spine in order for him to determine the correct treatment plan. (*Id*.)

Carlson next visited Dr. Dyste in June 1997. (T. 284.) Dr. Dyste noted that Carlson was continuing to experience lower back pain, with no change since January. (*Id*.) Based on the results of the MRI scan, Dr. Dyste concluded that Carlson was suffering from "two level degenerative disc disease" and that this was related to the June 1992 injury. (T. 285.) Dr. Dyste recommended that Carlson undergo a two level anterior lumbar interbody fusion. (*Id*.)

Radiology reports spanning the 1992 through 1997 time frame report a herniated disc at L5-S1 depressing the left S1 nerve root to a mild degree. (*See, e.g.,* T. 281.) These reports indicate that the test results indicate no change from the original exam completed in May 1992, through the 1997 tests. (*See* T. 280 & 281.)

At least two medical examinations took place as a result of Carlson's workers compensation claims. On January 29, 1997, Dr. Mark C. Engasser, conducted an independent medical examination of Carlson. (T. 518.) Dr. Engasser concluded that Carlson's 1992 injury was responsible for his current continued back and leg pain. (T. 524.) Dr. Paul T. Wicklund, conducted a medical examination on July 29, 1997. (T. 512.) Dr. Wicklund determined that Carlson's current back problems were related to a series of injuries beginning in the 1970s. (T. 517.) Dr. Wicklund stated that Carlson should be restricted from repetitive bending, twisting, stooping or lifting." (*Id*.) Dr. Wicklund declined to rate Carlson's disability until after the contemplated disc fusion surgery.

On January 2, 1998, Dr. Richard Hadden completed a Residual Physical Functional Capacity

form. After reviewing Carlson's medical record, Dr. Hadden concluded that Carlson could occasionally lift 20 pounds, frequently lift ten pounds, stand and or walk about six hours in an eight-hour work day, sit for about six hours in an eight-hour work day, only occasionally climb, stoop, crouch or crawl. (T. 296-96.) Dr. Hadden noted that he set Carlson's residual functional capacity at a light exertion level, rather than medium level, based on the self-reported symptoms and pain. (T. 299.) This evaluation was affirmed by Dr. Thomas Chisheim. (T. 310.)

On January 22, 1998, Dr. David Boxall submitted an evaluation of Carlson. (T. 525.) Dr. Boxall concluded that Carlson would be able to work full-time, but noted that Carlson should be limited to lifting no more than thirty-five pounds intermittently and that "he should avoid excessively long periods of sitting or standing in one position and repetitive bending or lifting." (T. 528.)

On April 27, 1999, Dr. Dyste completed a Residual Functional Capacity Assessment. (T. 320.) In the assessment, Dr. Dyste concluded that Carlson could lift no more than five pounds, stand or walk up to 10-15 minutes continuously for at least two hours in an eight hour day, sit up to 10-15 minutes continuously for a total of less that about six hours in an eight-hour work day, would need to lie down three times a day "to treat pain." (T. 322.) Dr. Dyste explained that the current pain and resulting limitations were due to degenerative disc disease and the disc fusion surgery. (T. 323.)

In June 2000, another functional examination was performed by John Hovde, MA PT. (T. 328-35.) Hovde summarized the sixteen-hour examination. (T. 328.) He also completed a functional abilities form. (T. 335.) Hovde indicated that Carlson is limited to sitting, standing or walking for no more than three hours in an eight-hour work day. (*Id.*) He also indicated that Carlson should only occasionally lift or carry 10 pounds. (*Id.*) Hovde noted that Carlson's "[p]erformance was limited due

to objective signs of difficulty." (*Id.*)

After the July 2003 administrative hearing, ALJ Herbert sent a letter to Dr. Dyste requesting that he clarify his position on the limitations described in the residual functional capacity evaluation. (T. 326.) Specifically, ALJ Herbert asked Dr. Dyste on what date he felt the stated restrictions were effective. (T. 327.) On October 1, 2003, Dr. Dyste responded stating that the restrictions were effective as of May 5, 1999. (*Id.*) He specifically noted that these restrictions were not effective prior to December 31, 1998. (*Id.*)

### V.  TESTIMONY AT ADMINISTRATIVE HEARING

An administrative hearing took place before ALJ Herbert on July 16, 2003. (T. 72.) Carlson was 45-years old at the time of the hearing. (T. 92.) Carlson was present and testified, as did Edward Utities, a vocational expert, and Dr. Julianne Koski, a medical expert. (T. 72.) At the hearing, Carlson amended his alleged onset date from April 4, 1992, to September 1, 1998. (T. 76-78.)

Carlson testified that the primary reason for his not seeking work was the persistent pain in his back. (T. 96.) He stated that he likes to walk. (*Id.*) He also stated that he enjoys fishing and that he fishes from the shore and by boat. (*Id.*) He explained that he fished for only tow hours beadue if he fished longer he would develop pain in is back. (T. 103.) He also expalined that after he went fishing, he would ned up in bed for a couple of days. (*Id.*)

Carlson testified that he relies on his wife's employment and proceeds from a worker's compensation settlement as a source of income. (*Id.*) Carlson testified that in September 1998, he would experience pain when he lifted a gallon of milk and that the most he felt he could lift was five pounds. (T. 99.) He testified that in1998, he could sit in one place for about 15-30 minutes and that

after one hour he would be "real sore." (T. 100.) He explained that he would not be able to sit for six hours in an eight hour workday because he would have ben unable to show up for wok the following day. (*Id.*) He also testified that he would have been able to stand for approximately 10-15 minutes at one time and that he would not have been able to stand for longer than two hours out of an eight-hour work day. (T. 101.) He explained that all of these limitations were because the "pain would have been too much." (*Id.*)

Carlson testified that, in 1998, there was no comfortable position that he could remain in for an extended period. He stated that lying down was the most comfortable position, but that after a while he would become stiff and would have to move. (*Id.*) He said that he slept approximately 12 or 14 hours a day. (T. 102.)

Carlson also testified about the pain medication he was taking at that time. He stated that he had tried several different pain medications and that none of them had worked very well. (T. 103.) He explained that he was currently taking approximately 40 to 60 tablets of over-the-counter pain medication, like aspirin or Anacin, daily. (*Id.*) He also explained that he eventually had surgery to help alleviate the pain, but that the surgery had not been helpful. (T. 104.)

Dr. Koski then testified about Carlson's impairments and limitations prior to September 1998. (T. 109.) Dr. Koski stated that the impairments that Carlson suffered from are chronic back and leg pain secondary to a degenerative disc disease. (T. 110.) She explained the functional limitations imposed by these impairments: occasionally lifting 20 pounds, but only 10 or more on a more frequent basis; stand or walk for a total of two hours in an eight hour day; sit for a total of six hours in an eight hour day, with the ability to change positions at least every 30 minutes; and no crouching, repetitive

9

bending and only occasional stooping or kneeling. (*Id.*)

Dr. Koski explained that she based her findings mainly on the objective medical evidence, although she did consider Carlson's subjective complaints of pain. (T. 112.) She acknowledged that Carlson's condition could cause pain and that the tolerance to pain is highly individualized. (*Id.*) She further explained that, although there was nothing in the record that was inconsistent with Dr. Dyste's opinion that Carlson would need to lay down three times a day, she noted that there was also nothing in the record that would substantiate that claim. (T. 113.)

The vocational expert, Edward Utities, testified that Carlson had no transferable skills from his past relevant work positions. (T. 116.) The ALJ next posed a hypothetical to the vocational expert based on Carlson's background, education, past relevant work, the medical evidence in the record, Dr. Koski's testimony, and his determination of Carlson's subjective complaints. (*Id.*) Included in the hypothetical were the following limitations: lifting occasionally 20 pounds and frequently 10 pounds; standing and walking limited to two hours in an eight-hour work day; siting limited to six hours in an eight-hour work day; requirement of a sit/stand option so as to be able to alternate between sitting and standing, walking every thirty minutes; crouching and repetitive bending from the waist, precluded, and limited to only occasionally stooping, kneeling, and crawling. (*Id.*)

Based on that hypothetical, the VE testified that there would be jobs in the regional economy that a person under the hypothetical would be able to perform. (*Id.*) The VE explained that an example was sedentary bench work assembly occupations that would include final assembler, bench hand, lens inserter, and band attacher, among others. (T. 117.) Utities stated that there were over 5,000 of such jobs within Minnesota. (*Id.*) In addition, the Ve testified that other examples of

appropriate jobs were surveillance system monitor with more than 500 jobs in the local economy, and account clerk, order clerk, telephone quotation clerk, and call operator with a total of more than 2,000 jobs within the state. (*Id.*) Utities noted that all of these jobs fell within the parameters as stated by the ALJ and were consistent with the standards and descriptions found in the Dictionary of Occupational Titles, except for the sit/stand option that was based on his professional experience. (*Id.*) Utities also explained that these numbers would be virtually identical to the number of jobs available in 1998. (*Id.*)

## VI.   THE ALJ'S FINDINGS AND DECISION

On January 30, 2004, ALJ Herbert issued his decision denying Carlson's application for DIB. The ALJ determined that Carlson met the insured status requirements through September 30, 1998. The ALJ then followed the sequential five-step procedure as set out in the rules. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a). The Eighth Circuit has summarized these steps as follows:

> The Commissioner must determine: (1) whether the claimant is presently engaged in "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity [RFC][4] to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Fines*, 149 F.3d at 895 (footnote added).

Based on the above, the ALJ determined that Carlson met the requirements for the first three

---

[4] A claimant's RFC is the most the claimant can still do despite the claimant's physical and/or mental limitations. 20 C.F.R. § 404.1545.

11

steps of the disability determination procedure. Specifically, the ALJ found that Carlson suffered from "mild shoulder problems and vision problems, and suffered from degenerative disc disease with disc herniations . . . of the lumber spine." (T. 39.) The ALJ additionally determined that the severity of these impairments was not sufficient to meet or equal a presumptively disabling impairment listed in the regulations. (*Id.*)

The ALJ then proceeded to evaluate Carlson's RFC. ALJ Herbert determined that Carlson "retained the capacity for a range of sedentary work not requiring lifting and/or carrying weight of more than ten pounds at a time, with the ability to alternate between sitting and standing after every thirty minutes, no more than a minimal exposure to vibrations, with only rare bending, twisting and stooping, and no work requiring depth perception in the right eye or work requiring the use of two eyes." (*Id.*) The ALJ found that Carslon's testimony was not credible to the extent that it was inconsistent with the ALJ's RFC. (*Id.*) Based on the RFC, and considering Carlson's age, experience, and past work experience, and the testimony of the VE, the ALJ determined that Carlson could not perform his past relevant work, but that he would be able to perform other jobs which existed in significant numbers in the regional and national economy. (*Id.*) Accordingly, ALJ Herbert found that Carlson was not disabled under the regulations imposed by the Social Security Act. (T. 40.)

## VI.   DISCUSSION

### A.   *Standard of Review*

This court will affirm the ALJ's findings that the claimant was not under a disability if the findings are supported by substantial evidence based on a review of the entire record. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). "Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support the decision." *Id.* (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).  The review the court undertakes, however, must go beyond solely the examination of the record for evidence in support of the Commissioner's decision. *Id.*  The court must additionally examine the record for evidence that detracts from that decision. *Id.*  Nevertheless, as long as there is substantial evidence to support the decision, this court will not reverse it simply because substantial evidence exists in the record that would support a contrary outcome or because this court might have decided differently.  *See Id.*

   B. *Analysis of Decision*

Carlson does not challenge the ALJ's decision with respect to the first four steps of the analysis. Carlson's main contention is that the ALJ failed to properly apply the *Polski* factors and incorrectly found that Carlson's subjective complaints were not credible.  Based on that argument, Carlson further asserts that because the ALJ improperly found that Carlson's testimony was incredible, they hypothetical as posed to the VE did not contain all of Carlson's limitations and therefore was not based on substantial evidence.

    1. <u>The ALJ's Determination of Carslon's Credibility</u>

In determining the credibility of a claimant's subjective complaints, the ALJ looks to several factors as set out in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984).  These factors include: daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions.  *Id.* at 1322.  These factors must be considered in the light of "the claimant's prior work record, and observations by third parties and treating and examining physicians."  *Id.*

13

Carlson argues that the ALJ failed to conduct the proper credibility analysis under *Polaski*. (Pl. Mem. at 8.)  Specifically, Carlson argus that ALJ Herbert failed to discuss all of the *Polaski* factors and failed to fully explain his reasoning regarding the factors that he did discuss.  (Pl. Mem. at 9.)  The Commissioner argues that ALJ Herbert used the proper standard when evaluating Carlson's subjective complaints and properly discussed the relevant Polaski factors.  In addition, the Commissioner argues that even if the ALJ had failed to discuss some of the Polaski factors in depth, this by itself would not be reversible error and that the ALJ's determination of non-disability was based on substantial evidence and should be affirmed.  (Def. Mem. at 10.)

"[A]n ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them."  *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005).  An ALJ may, however, discount a claimant's subjective complaints if the complaints are inconsistent with the record as a whole.  *Id.*  An ALJ who determines that a claimant's subjective complaints lack credibility must "make an express credibility determination explaining his reasons for discrediting the complaints."  *Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (quoting *Ghant v. Bowen*, 930 F.2d 633, 637 (8th Cir.1991)).  If an ALJ provides such reasoning, the ALJ's determination of a claimant's credibility is afforded great deference.  *See Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).  A court should not "disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain."  *Goff*, 421 at 792 (quoting *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001)).

Here, ALJ Herbert stated that he did not find Carlson's subjective complaints of disabling pain and incapacitating limitations as fully credible because the complaints were inconsistent with the

objective medical records. (T. 13.) In his decision, ALJ Herbert explains in detail how the objective medical evidence was inconsistent with Carlson's complaints of disabling pain. (*See* T. 31-35.) The ALH, however, did not base his decision solely on the objective medical evidence but also discussed the functional restrictions as set forth by treating and consulting physicians, the dosage and side effects of medication, Carlson's intermittent complaints of pain, Carlson's motivation to seek employment, and Carlson's daily activities and how these factors related to the determination of credibility. For example, the ALJ noted that the opinions of several treating and consulting doctors, regarding Carlson's functional restrictions and limitations prior to September 1998, were inconsistent with Carlson's complaints. (T. 35.) ALJ Herbert also discussed Carlson's use of medication and side affects, specifically noting that Carlson's use of solely over-the-counter pain medication was not consistent with complaints of disabling pain. (T. 37.) The ALJ explained that Carlson's complaints of disabling pain were inconsistent with Carlson's periodically seeking treatment "with long periods of absence between treatments." (*Id.*) The ALJ also considered Carlson's daily activities, noting that his reported activities were inconsistent with disabling pain. (*Id.*) The ALJ also considered reports by Carlson's friends and neighbors (T. 31.) and Carlson's past work history (T. 38.) and stated that he had given Carlson's complaints the benefit of all reasonable doubt (T. 31.).

Even if ALJ Herbert had failed to discuss each *Polaski* factor, the court would not reverse the decision if he gave good reasons why he discounted the complaints. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 ( 8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every [*Polaski*] factor is not discussed in depth."). Here, ALJ Herbert lists all of the *Polaski* factors, discusses these factors, and discusses his reasons for

15

discounting Carlson's subjective complaints. Thus, the court finds that ALJ Herbert complied with *Polaski* and supplied good reason to discount Carlson's complaints of disabling pain. *See Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996).

### 2. The Hypothetical Posed to the Vocational Expert

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." *Goff*, 421 at 794 (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir.2001)). The ALJ need not include limitations that are not based on substantial evidence. *See Haggard v. Apfel*, 175 F.3d 591, 595, (8th Cir.1999). Carlson argues that because the ALJ's improper credibility finding was the basis for the RFC in the hypothetical, the hypothetical as posed to the VE was not based on substantial evidence. The court has found, however, that the ALJ properly determined Carlson's credibility and thus, properly included in the hypothetical all of the limitations that were supported by substantial evidence in the record.

### VIII. CONCLUSION AND RECOMMENDATION

The court finds that, based on a review of the record, the ALJ's decision that Carlson failed to meet the criteria for DIB is based on substantial evidence in the record. Accordingly, the court **recommends** that Carlson's Motion for Summary Judgment [Docket No. 20] **be denied** and the Commissioner's Motion for Summary Judgment [Docket No. 23] **be granted.**

Dated: January 13, 2006

                                            s/ Arthur J. Boylan
                                            Arthur J. Boylan
                                            United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **February 3, 2006.**